CALVERT B. COTTRELL AND ANOTHER *vs*. THE BABCOCK
PRINTING PRESS MANUFACTURING COMPANY.

New London Co., May T., 1886. PARK, C. J., CARPENTER, PARDEE,
LOOMIS and GRANGER, Js.

A sale by one partner in a manufacturing firm to the other of all his in-
terest in the property of the firm of every kind and in the good will of
the business, gives the vendee the right to carry on the same business
at the same place as the successor of the old firm.

But it does not preclude the selling partner from setting up a similar business in any place he chooses, and by advertisement, letters and personal application soliciting the custom of the old customers of the firm, so long as he does not represent himself as the successor of the old firm or represent the purchasing partner as not carrying on the business.

To warrant a court of equity in decreeing a restraint of trade, there must be a clear contract for such restraint.

The question whether an advertising card, issued in such a case by the selling partner, is of such a character as to deceive purchasers, is one of fact.

[Argued May 26th—decided June 18th, 1886.]

Suit for an injunction against the making and selling, or advertising or offering for sale, a certain kind of printing press, and from using a certain trade-name or trade-mark, and for an account; brought to the Superior Court in New London County, and heard before *Beardsley, J.* The following facts were found by the court:—

Calvert B. Cottrell and Nathan Babcock, both residents of Stonington in this state, formed a co-partnership in 1855 under the name of Cottrell & Babcock, and carried on the business of manufacturing and selling machinery at the town of Stonington. In 1867 they commenced to manufacture and sell printing presses and printing machinery, and so continued up to July, 1880.

The firm manufactured lithographic stop cylinder, two revolution, and drum cylinder printing presses. The presses so manufactured and sold embodied many novel mechanical features and devices which were of great utility and value, by reason of which the presses became widely known among publishers and printers. The firm expended large sums of money in perfecting the mechanical arrangements and devices embodied in their printing presses and also in advertising the presses. The printing presses, while manufactured by the firm, had cast upon their frames the words " Cottrell & Babcock," and were stamped, marked, advertised and sold in large quantities, and were known in the market and to printers, publishers and purchasers as the " Cottrell & Babcock " printing presses.

In July, 1880, the co-partnership was dissolved by mutual consent. On the twenty-seventh day of that month the following agreement was entered into between Cottrell and Babcock:—

" Whereas the co-partnership heretofore existing under the name of Cottrell & Babcock has been by mutual consent dissolved; and whereas the said Nathan Babcock has preferred his petition to Hon. John D. Park, Judge of the Superior Court, for the appointment of a receiver of the partnership assets; and whereas in order to settle and determine all differences existing between said partners relative to their settlement of their partnership accounts and respective interests in said firm, they mutually agree as follows:—

" *First.* That the said Nathan Babcock agrees to sell, assign, transfer and convey to said Calvert B. Cottrell all his right, title and interest in and to the partnership assets of every name and nature, including all patent rights, good will and trade-marks, whether in his own name or in the co-partnership name, for the sum of $29,000 in cash and the transfer to him of eighty-four shares of the capital stock of the New Williamsburg & Flatbush Railroad Company, now held by William B. Waite as security for the sum of about $1,600, upon the release by said Waite of said stock upon the payment of said sum as security for which it is now held, and the agreement of the said Calvert B. Cottrell to assume and pay all the debts and liabilities of said firm of every description.

" *Second.* The said Calvert B. Cottrell agrees to pay the said $29,000 as follows:—$3,000 within ten days; $13,000 with interest within sixty days; and the balance of $13,000 with interest within ninety days. And within ten days from date the said Calvert B. Cottrell agrees to transfer to the said Babcock as aforesaid the said eighty-four shares of stock of said railroad company, and further agrees that he will assume and pay all the indebtedness and liabilities of said firm of every description as they fall due, and save the

said Babcock harmless therefrom, and from all costs, loss or damage on account of the same.

" *Third.* That said Calvert B. Cottrell further agrees that he will, on or before the first day of January, 1882, remove the savings bank mortgage, which was given to secure a debt of said co-partnership by said Nathan Babcock upon his residence, and that as soon as practicable, and within the time limited by the trust deed, he will procure the said property to be released from the incumbrance of the conveyance in trust to Thomas Greenman, to secure said partnership creditors.

" *Fourth.* The said Nathan Babcock agrees that, upon the full payment of said $29,000 as stipulated, and the transfer of said eighty-four shares of stock as aforesaid, the said Babcock will execute and deliver to said Calvert B. Cottrell any and all instruments of transfer necessary and proper to convey to said Cottrell all of said Babcock's interest in and to the assets and property before mentioned, but without recourse to him, including all rights pertaining to the same of whatsoever description.

" *Fifth.* It is expressly understood that no obligation shall be contracted and no business carried on in the name of Cottrell & Babcock, except as hereinafter provided.

" *Sixth.* The said Calvert B. Cottrell agrees that upon the conveyance by said Babcock to him as hereinbefore stated, the railroad stock and the Pawtucket stock, if not already properly transferred to said Greenman, as trustee, shall be properly transferred to him for the purposes mentioned in the trust deed of Cottrell & Babcock to Thomas S. Greenman, dated the twenty-sixth day of August, 1879; and further, that the machinery now in their factory shall be conveyed to said Greenman in trust, by specific description, in compliance with the laws of this state, to make the same a valid security for the uses and purposes mentioned in said trust deed, and subject to said trust. That said property shall be conveyed to said Greenman for the further trust of securing said Nathan Babcock against any liability,

loss, costs or damage arising on any claim by R. Hoe & Company.

" And said Babcock further agrees to take such necessary steps to execute all conveyances that may be necessary for the transfer and conveyance of all his right, title and interest in the stock of said Pawtucket Manufacturing Company and the said New Williamsburg Railroad Company to said Greenman in trust.

" And it is further agreed that said Cottrell shall have authority to use the company name of Cottrell & Babcock in liquidation and settlement of all matters growing out of said partnership and its dissolution, and not to be used for the purpose of creating any new liability.

" In witness whereof we, the said Calvert B. Cottrell and Nathan Babcock, have hereunto set our hands and seals the 27th day of July, A. D. 1880.

" C. B. COTTRELL.     [L. S.]

" NATHAN BABCOCK.     [L. S.]"

Cottrell kept and performed all of the agreements by him made in the above contract, and performed all of the obligations by him therein assumed.

On the 16th day of September, 1880, Babcock executed and delivered to Cottrell two instruments in writing for the purpose of carrying out the contract.

The first of these instruments, omitting the introductory part, which refers to the contract of July 27th, 1880, was as follows :—

" Now therefore, for and in consideration of the sum of one dollar, to me in hand paid, and other good and valuable consideration the receipt of which is hereby acknowledged, I, the said Nathan Babcock, have sold, assigned, transferred and set over, and by these presents do sell, assign, transfer and set over, unto the said Calvert B. Cottrell all my right, title and interest in and to each and every of the letters patent set forth in the schedule hereto annexed, which is hereby made a part of this instrument, together with the invention or inventions therein and thereby secured, and

also all my right, title and interest in and to any other letters patent or inventions owned or used by said firm, the said letters patent to be held and enjoyed by the said Calvert B. Cottrell for his own use and behoof, and for the use and behoof of his legal representatives, to the full end of the term for which each and every of said letters patent are or may be granted (including any reissue or reissues, extension or extensions thereof), as fully and entirely as the same could have been held and enjoyed by me had this assignment and sale not been made.

"And for a like consideration, the receipt of which I hereby acknowledge, I, the said Nathan Babcock, have sold, assigned, transferred and set over, and by these presents do sell, assign, transfer and set over unto the said Calvert B. Cottrell, all my right, title and interest in and to all trade marks owned or used by the said firm of Cottrell & Babcock in the manufacture and sale of printing presses and printing machines.

"And it is further covenanted and agreed by the said Nathan Babcock that he will sign, execute and deliver, (but without expense to him,) any and all petitions, applications or papers, which may be necessary to enable the said Cottrell, his legal representatives or assigns, to obtain and secure any reissue or reissues, extension or extensions, of all or any of said letters patent set forth in the schedule hereto annexed or which are assigned as aforesaid.

"It being understood that this sale and assignment is without recourse against said Babcock.

"In witness whereof I have hereunto set my hand and seal this sixteenth day of September, A. D. 1880.

"NATHAN BABCOCK.  [L. S.]"

The schedule attached was a list of patents, twenty-six in number, all of which were for improvements in printing presses.

The other instrument above referred to was a quit claim deed from Nathan Babcock to Calvert B. Cottrell of all his interest in the real estate upon which the business of Cot-

trell & Babcock had been carried on, and in the personal property of the late firm of every kind, including its stocks, bonds, accounts and contracts.

Immediately after the dissolution of the firm of Cottrell & Babcock, Cottrell associated with him in the business of manufacturing and selling printing presses and printing machinery his son, Edgar H. Cottrell, under the name of C. B. Cottrell & Co., and succeeded and carried on as successors the business formerly conducted by Cottrell & Babcock.

The rights and interests acquired by Calvert B. Cottrell under the contract of purchase, and the conveyances in pursuance thereof, were valuable in carrying on the business.

On July 12th, 1882, the Babcock Printing Press Manufacturing Company was organized under the joint stock laws of this state, and located at New London, in this state, the stockholders of which company consisted of the said Nathan Babcock, one Charles B. Maxson, and one George P. Fenner. Nathan Babcock was secretary and treasurer of the company, and Maxon president, and Fenner superintendent of the same. Maxon and Fenner were formerly employed for several years by Cottrell & Babcock, and were subsequently in the employ of C. B. Cottrell & Co.

After the organization of the Babcock Printing Press Manufacturing Company, the corporation commenced the business of manufacturing and selling printing presses at New London, and caused to be printed, published, and widely circulated among printers, publishers, and others, an advertising card, of which the following is a copy :—

THE

## BABCOCK PRINTING PRESS MAN'F'G CO.

Manufacturers of

DRUM CYLINDER, STOP CYLINDER

and LITHOGRAPHIC PRESSES,

New London, Conn.

NATHAN BABCOCK,

of the late firm of

| CHAS. B. MAXON, PRESIDENT. | COTTRELL & BABCOCK, | GEO. P. FENNER, SUPT. |

SECTY. & TREAS.

Between three and four thousand of these cards were sent by mail, and distributed among printers and publishers, including many of the old customers of the firm of Cottrell & Babcock. Prominence was given to the name of "Cottrell & Babcock" in the printing of the card, and also to the name of Nathan Babcock, by printing these names in more conspicuous letters than any other words upon the card, and also the words "of the late firm of" were printed in much smaller type than any other words on the card. The different sizes of type were used by the printers in printing the card without any instruction from the defendant, and the card was not designed or adapted to mislead any person who read it.

After the sale and conveyances above mentioned Babcock wrote and sent by mail the following letter to one of the old customers of Cottrell & Babcock, namely, Van Antwerp, Bragg & Co., of Cincinnati, Ohio, soliciting their patronage, which letter was duly received by them.

"*New London, Conn., Oct.* 19*th,* 1883.

" Messrs. VAN ANTWERP, BRAGG & CO., Cincinnati, O.

"*Gentlemen :*—Your valued favor of the 15th is at hand and contents noticed. We regret that we are not able to send catalogue of stop cylinder presses, as we have not yet published one of that class. We will mail you a photograph of our new lithograph press which is now completed, and we intend that our stops shall be similar in style and appearance. We should *very* much like to furnish you some stops, and can guarantee them equal in every respect to anything you have seen. We have a new lock motion, for which patents are now pending, which works remarkably smooth and holds the cylinder very firm. We do not know how many presses you want, but we could furnish you three or four in four to six months. If you could make above time answer we shall be happy to call on you and if possible arrange to furnish them. We have the patterns to make, which necessitates so much time. We have no need to assure you that we can furnish a first-class press when we say that our Mr.

Fenner has made *all* the working drawings ever used by the late firm of Cottrell & Babcock on that class of presses, and that, with the dictation of the writer, he made *all* the plans, measures, movements and proportions of said presses; hence we flatter ourselves that no builders better understand the requirements of a stop cylinder than we do, and certainly none would exert themselves more to furnish a *first-class* press.    Please let us hear from you, and oblige,

    Yours respectfully,

     THE BABCOCK PR'T'G PRESS MFG. CO."

This letter was in reply to the following from that firm:—

      " *Cincinnati*, 15*th Oct.*, 1883.

" BABCOCK PRINTING CO., New London, Conn.

 " *Gentlemen :*—We will be wanting a few presses soon. Please send us one of your catalogues.    Our wants are stop cylinders to print matter 30 x 41.    Do your presses resemble Cottrell & Babcock's, of which we have a number?    What would you make us a press for, as per above, delivered here, set up?    Send catalogue.

    Very respectfully,

     VAN ANTWERP, BRAGG & CO."

Babcock also, by visit in response to a letter from them, personally solicited one Yewdale, of Yewdale & Co., of Milwaukee, Wisconsin, to patronize the Babcock Printing Press Manufacturing Company.    Yewdale was a member of the firm of Yewdale & Co., who were old customers of the old firm of Cottrell & Babcock.

The Babcock Printing Press Manufacturing Company, by their agents and servants, and by their private circulars, cards and newspaper advertisements, solicited the general public to purchase printing presses manufactured by them, and also in the same manner and by the same means solicited the old customers of the firm of Cottrell & Babcock and of their successors, C. B. Cottrell & Co.

After the dissolution of the co-partnership and the pur-

chase by Cottrell of Babcock's interest in the partnership assets, Cottrell and C. B. Cottrell & Co., as the successors of the firm of Cottrell & Babcock, continued for a time to manufacture and sell printing presses, stamped with the trade name of " Cottrell & Babcock, New York," thereon.

Customers of the old firm of Cottrell & Babcock, and thereafter of C. B. Cottrell & Co., as their successors, have occasionally written and telegraphed to Cottrell & Co., and addressed them as C. B. Babcock & Co., Babcock & Son, and Babcock & Cottrell.

Upon these facts the plaintiffs claimed, and asked the court to rule :—

*First.* That the firm of Cottrell & Babcock had acquired a valuable trade mark in the name of " Cottrell & Babcock," as so used on their machines ; and also a valuable trade name and good-will in the business so advertised and conducted, which it was the duty of a court of equity to protect.

*Second.* That this trade mark, trade name and good-will became vested in and the property of the plaintiffs by the assignments of Babcock, and the association of C. B. Cottrell and his son, Edgar H. Cottrell, under the name of C. B. Cottrell & Co., conducting the same business at the old stand.

*Third.* That thereby C. B. Cottrell & Co. became and were the sole successors to the late firm of Cottrell & Babcock, and as such were entitled to all the advantages and benefits of the trade names, trade marks and good-will of the old firm.

*Fourth.* That the advertising card issued by the defendant was calculated, if not intended, to infringe the trade mark, and also to injure the trade name and good-will so acquired, and the defendant should be enjoined from its use.

*Fifth.* That the plaintiffs were the lawful and sole successors of the late firm of Cottrell & Babcock, and that the defendant had no right so to advertise or conduct its business as to induce the public to believe that it, or any of its officers, represented or were successors to that firm ; and

that the advertising card of the defendant was so calculated to deceive and had deceived the public, and had induced the belief that the firm of Cottrell & Babcock had been dissolved, and that Babcock and the defendant were its representatives and successors.

*Sixth.* That the solicitation by the defendant by letter and personal appeal to the old and well known customers of Cottrell & Babcock and the attempt to divert their custom from the plaintiffs as successors of that firm to themselves, was an unlawful interference with the plaintiffs' rights.

The court did not so rule, but found the issues for the defendants. The plaintiffs appealed to this court. The reasons of appeal as filed are given in full in the opinion of the court.

*A. Brandegee* and *C. Perrin,* for the appellants.

1. The firm of Cottrell & Babcock owned at the date of its dissolution the good-will of its trade, which good-will was part of the assets and property of the firm. The good-will of a business consists in the advantage or benefit which arises from an established connection with customers, in the reputation for skill, or any other advantage acquired by the old firm, and in the chance of keeping and improving former connections; and is an important and valuable interest which the law recognises and will protect. Bouvier's Law Dict. *in verbum;* Story on Partn., § 99; Lindley on Part., (4th ed.,) 859; Pomeroy's Eq. Jur., § 1355; Browne on Trade Marks, §§ 90, 91, 521; High on Injunctions, (2d ed.,) § 1345; *Churton* v. *Douglas,* Johnson, (Eng.,) 174; *Cruttwell* v. *Lye,* 17 Ves., 335; *Potter* v. *Commissioners,* 10 Exch., 147; *Levy* v. *Walker,* L. R., 10 Ch. Div., 436; *Holden's Admrs.* v. *M'Makin,* 1 Pars. Eq. Cas., 270; *Williams* v. *Wilson,* 4 Sandf. Ch., 379; *Dougherty* v. *Van Nostrand,* 1 Hoff. Ch., 68; *Dwight* v. *Hamilton,* 113 Mass., 175. Upon the sale of the business and good-will of a partnership the trade name is included. Story on Part., (7th ed.,) § 100, and note; *Banks* v. *Gibson,* 34

Beav., 566; *Witt* v. *Corcoran*, L. R., 2 Cha. Div., 69; *Sohier* v. *Johnson*, 111 Mass., 238; *Adams* v. *Adams*, 7 Abb. N. C., 292; *Kellogg* v. *Totten*, 16 Abb. Pr. R., 35. The good-will of the business of a firm is part of the assets of the firm. High on Injunctions, (2d ed.,) § 1345; *Hall* v. *Barrows*, 10 Jur., N. S., 55; *Wedderburn* v. *Wedderburn*, 22 Beavan, 84; *Bradbury* v. *Dickens*, 27 id., 53; *Smith* v. *Everett*, id., 446; *Mellersh* v. *Keen*, 28 id., 453; *Williams* v. *Wilson*, 4 Sandf. Cha., 379; *Dougherty* v. *Van Nostrand*, 1 Hoffm. Ch., 68; *Holden's Admrs.* v. *M'Makin*, 1 Pars. Eq. Cas., 270; *Bininger* v. *Clark*, 10 Abb. Pr. R., N. S., 264; *Sheppard* v. *Boggs*, 9 Neb., 258. The old firm of Cottrell & Babcock were widely known as manufacturers of printing presses and machinery, which embodied many novel features of great value and utility. They had expended large sums of money in advertising, and had a large number of customers among printers and publishers, to whom their manufactures were favorably known. This appears fully in the finding.

2. The good-will of the firm of Cottrell & Babcock was sold and transferred to and became the property of Cottrell, and has since become and now is the property of the plaintiffs. The court below has found as matter of fact that an agreement in writing and under seal was entered into between Cottrell and Babcock, under date of July 27th, 1880, wherein Babcock agreed, in consideration of certain payments of money, &c., " to sell, assign, transfer, and convey to Cottrell all his right, title, and interest in and to the partnership assets of every name and nature, including all patent rights, good-will, and trade marks; " and that Cottrell has kept and performed all his agreements made and all obligations assumed by him in that instrument. Babcock having agreed to convey to Cottrell all his interest in the property, good-will, &c., of the firm, and having received from Cottrell the full amount of the consideration agreed, the interest of Babcock in the same must be found to be vested in Cottrell, even in the entire absence of any subsequent transfer or conveyance. But the good-will being a part of the partnership assets, the interest of Babcock in

the good-will of the firm was duly conveyed to Cottrell by a sufficient instrument under seal dated September 16th, 1880. That instrument conveys in express terms *all* the right, title and interest of Babcock in and to *all* the personal property of the firm of Cottrell & Babcock of every name, nature and description. *Shipwright* v. *Clements*, 19 W. R., 579. The plaintiffs became the owners and possessors of the valuable rights and interests acquired by Cottrell, and succeeded to and carried on as successors the business formerly conducted by Cottrell & Babcock.

3. The defendants have infringed the rights of the plaintiffs by the commission of acts which are likely to result in the appropriation to their own use of the benefits and advantages belonging to and arising from the good-will to which the plaintiffs are entitled. The value of the good will of a business depends to a very great extent on the absence of competition on the part of those by whom the business has been previously carried on, and a person disposing of his interest in a good-will has no right to interfere with or solicit business from customers of the old firm by letters, cards, circulars or otherwise. Such customers form the good-will. Lindley on Part., (4th ed.,) 859; *Ginesi* v. *Cooper*, L. R., 14 Ch. Div., 596; *Leggott* v. *Barrett*, 15 id., 306; *Burrows* v. *Foster*, 32 Beav., 18, note; *Labouchere* v. *Dawson*, L. R., 13 Eq. Cas., 322; *Hall's Appeal*, 60 Penn. St., 458; *Angier* v. *Webber*, 14 Allen, 211. Nor will he be allowed to use an advertisement or announcement which will lead the public to believe that he is entitled to the good-will of the old firm. The question is not alone whether it will mislead those who read it as a whole, but whether it is likely to mislead those who may see or be impressed by its more conspicuous parts. *Edelsten* v. *Edelsten*, 1 DeG., J. & S., 185; *Hirst* v. *Denham*, L. R., 14 Eq. Cas., 542; *Wotherspoon* v. *Currie*, L. R., 5 H. L. Cas., 508. A trader may refer to the name of his rival in advertisements, but he must do it in such a way as to obviate any reasonable probability of misunderstanding or deception. *Singer Mfg. Co.* v. *Loog*,

L. R., 8 App. Cas., 15. A man must not use his own name so as to deceive the public. *Clark* v. *Clark*, 25 Barb., 76 ; *Regina* v. *Dundas*, 6 Cox Cr. Cas., 380. A corporation may be restrained from dealings prohibited to a stockholder, when the connection of such stockholder with the corporation is made conspicuous. *Beal* v. *Chase*, 31 Mich., 490 ; *McGowan Bros.' Pump & Machine Co.* v. *McGowan*, 2 Cinc. S. C., 313 ; *Bradley* v. *Norton*, 33 Conn., 164 ; *Holmes, Booth & Haydens* v. *Holmes, Booth & Atwood Manf. Co.*, 37 id., 278. The defendants have solicited the business of the old customers of Cottrell & Babcock, through the personal acts of Babcock, and by letters and circulars sent to and distributed among them. They have also solicited the business of the old customers by means of a card, in which prominence has been given to the name of Cottrell & Babcock, by printing the same in conspicuous letters, while the words "of the late firm of," immediately preceding the names of Cottrell & Babcock, were printed in very small type. They have also, by the use of the card, solicited from the public at large such custom as would naturally be given and properly belongs to the plaintiffs, who are owners of the good will of the late firm. The matter stated as a finding of fact in the following words : "Said card was not designed and adapted to mislead any person who read it," is not a sufficient answer to the charge that the defendants have infringed the rights of the plaintiffs. It is not a finding of fact, but is a statement of a conclusion from facts already found, and as such may be revised as error. It states only the opinion of the judge as to the probable effect of the card upon the minds to whom it was sent. As to that part of the statement which is to the effect that the card was not *designed* to mislead, the sufficient answer is that it has no bearing on the issue. What the defendants *intended* to do is immaterial. If they have made use of any devices likely to deceive or mislead customers or the public at large, they must be enjoined from such use. *Glenny* v. *Smith*, 2 Dr. & Sm., 476 ; *Leather Cloth Co.* v. *Am. Leather Cloth Co.*, 1 Hem. & Mil., 271 ; *Perry* v. *Truefit*, 6 Beav.,

66; *Croft* v. *Day*, 7 id., 84; *Harper* v. *Pearson*, 3 L. T., (N. S.,) 547; *Witt* v. *Corcoran*, L. R., 2 Ch. Div., 69; *Hookham* v. *Pottage*, L. R., 8 Cha. App., 91; *Levy* v. *Walker*, L. R., 10 Ch. Div., 436; *Churton* v. *Douglas*, Johnson, (Eng.,) 174; *Scott* v. *Scott*, 16 L. T., (N. S.,) 143; *Stevens* v. *Paine*, 18 id., 600; *Mogford* v. *Courtenay*, 45 id., 303; *Millington* v. *Fox*, 3 Myl. & Cr., 338; *Clark* v. *Clark*, 25 Barb., 76; *Dale* v. *Smithson*, 12 Abb. Pr. R., 237; *Smith* v. *Cooper*, 5 Abb. N. C., 274; *Colton* v. *Thomas*, 2 Brewst., (Pa.,) 308; *Avery* v. *Mickle*, 18 W. Jur., 292; *Glen & Hall Manf. Co.* v. *Hall*, 61 N. York, 234. The inspection of the card itself in connection with the finding of facts, divested of any conclusions, will show that it was likely to mislead, and might be interpreted by different people in different ways, all to the disadvantage and injury of the plaintiffs. It might be understood to mean that the old firm of Cottrell & Babcock had been dissolved and was without successors; or that the defendant was the only successor of the old firm; or that the only person now engaged in that business, and who was a partner in the old firm, is Nathan Babcock. There should be a decree enjoining the defendants from using the name of Cottrell & Babcock, and from soliciting trade from the customers of the late firm of that name, and for an account as prayed in the complaint.

*J. Halsey* and *S. Lucas*, for the appellees, contended that the court below had found as a fact that the card issued by the defendants "was not intended nor adapted to deceive"; that this was a question of fact the finding upon which could not be reviewed in this court, (*Dudley* v. *Deming*, 34 Conn., 174; *Goodsell* v. *Sullivan*, 40 id., 83; *Spurr* v. *Coffing*, 44 id., 147; *Rogers & Bro.* v. *Rogers*, 53 id., 147;) that the defendants did the plaintiffs no legal wrong in soliciting the custom of the old customers of the firm, if they practiced no deceit by falsely assuming the name and credit of the old firm, (*Thompson* v. *Winchester*, 19 Pick., 214;) that the sale of the good-will of the business to Cottrell could not prevent Babcock from engaging at

once in a similar business unless it was specially so pro-vided in the contract of sale, which was not the case, (Browne on Trade Marks, §§ 523, 524, 526; Cox's Trade Mark Cases, Nos. 13, 17, 25, 406; *Schackle* v. *Baker*, 14 Ves., 468; *Bassett* v. *Percival*, 5 Allen, 347;) that courts will be specially cautious not to impose unnecessary re-straints upon competition in trade, (Browne on Trade Marks, § 401;) and that the only restraint Babcock was under after selling the business to Cottrell was, that he would not be permitted to hold himself out to the world as carrying on the business of the old firm or that his presses were the presses manufactured by the plaintiffs, (*Churton* v. *Douglas*, Johnson, (Eng.), 174; *Holmes, Booth & Haydens* v. *Holmes, Booth & Atwood Manf. Co.*, 37 Conn., 294; *Morgan* v. *Schuyler*, 79 N. York, 490; *Hegeman* v. *Hege-man*, 8 Daly, 1; *Carmichel* v. *Latimer*, 11 R. Isl., 395; *Bergamini* v. *Bastian*, 35 Louis. Ann., 60; Notes in 35 Am. Reps., 546, 550, and 48 id., 232.)

PARDEE, J. (after stating the facts). The plaintiffs' appeal presents the following reasons of appeal:—

1. That the court erred in ruling that the plaintiffs upon these facts had not "acquired a valuable trade name and good-will in the business so advertised and conducted, which it was the duty of a court of equity to protect."

2. That the court erred in refusing to rule that the plain-tiffs were the lawful and sole successors of the late firm of Cottrell & Babcock, and that the defendant had no right so to advertise or conduct its business as to induce the public to believe that it, or any of its officers, represented or were the successors of said firm.

3. That the court having found as a fact that "the card gives prominence to the name of Cottrell & Babcock," that "the words '*of the late firm of*' were printed in much smaller type than any other words printed on said card," and "that said card was distributed among many of the old customers of the old firm of Cottrell & Babcock," erred in ruling that said card "was not adapted to mislead any person who had it."

4. That the court having found as a fact that said Nathan Babcock, after the conveyance aforesaid, personally and by letter, and that the defendants by their circulars, cards and advertisements, did solicit the patronage of customers of the old firm to the new firm, erred in ruling "that such an attempt to divert their custom was not an unlawful interference with the plaintiffs' rights."

Of course in the use of similar names, signs, advertisements, labels and cards, there is a wide field for efforts to mislead the public. There is the slight resemblance which would deceive only the most careless and the almost perfect reproduction which would deceive all save the most careful person of a thousand. And it must always remain a question of fact, as to whether the resemblance rises to the degree which constitutes it an injurious deception. Under our practice in this case the Superior Court inspected the card, saw the style and size of type, noted what is said and what is left unsaid, and heard evidence as to confusion of names, as to the misleading of possible customers and as to all other matters, and from the whole deduced and conclusively determined the resulting fact that no person would be led by the card to believe that the printing presses therein mentioned are manufactured by the plaintiffs, or that they have ceased to manufacture, or that the Babcock Printing Press Manufacturing Company had upon their cessation from the manufacture taken up and continued the business which they had dropped. By that finding this court is bound, and it answers the first three reasons for appeal.

In the contract terminating the partnership relation which had existed between Cottrell and Babcock, it is provided that no business shall thereafter be carried on in the name of that firm ; thus reserving to each the full right to the use of his name. Cottrell did not require Babcock to agree, and the latter did not agree, to abstain from the manufacture of printing presses. By purchasing the good-will merely, Cottrell secured the right to conduct the old business at the old stand, with the probability in his favor

that old customers would continue to go there. If he desired more he should have secured it by positive agreement; the matter of good-will was in his mind; presumptively he obtained all that he desired. At any rate the express contract is the measure of his right; and since that conveys a good will in terms but says no more, the court will not upon inference deny to the vendor the possibility of successful competition by all lawful means with the vendee in the same business. No restraint upon trade may rest upon inference. Therefore, in the absence of any express stipulation to the contrary, Babcock might lawfully establish a similar business at the next door, and by advertisement, circular, card, and personal solicitation, invite all the world, including the old customers of Cottrell & Babcock, to come there and purchase of him; being very careful always, when addressing individuals or the public, either through the eye or the ear, not to lead any one to believe that the presses which he offered for sale were manufactured by the plaintiffs, or that he was the successor to the business of Cottrell & Babcock, or that Cottrell was not carrying on the business formerly conducted by that firm. That he may do this by advertisements and general circulars courts are substantially agreed, we think. But some have drawn the line here and barred personal solicitation. They permit the vendor of a good-will to establish a like business at the next door, and, by the potential instrumentalities of the newspaper and general circulars, ask the old customers to buy at the new place, and withhold from him only the instrumentality of highest power, namely, personal solicitation. To deny him the use of the newspaper and general circulars is to make successful business impossible, and therefore is to impose an absolute restraint upon the right to trade. This the courts could not do except upon express agreement. But possibly the old customers might not see these; and in some cases the courts have undertaken to preserve this possibility for the advantage of the vendor and found a legal principle upon it. Other courts have been of the opinion that no legal principle can be

made to rest upon this distinction; that to deny the vendor personal access to old customers even, would put him at such disadvantage in competition as to endanger his success; that they ought not upon inference to bar him from trade either totally or partially; and that all restraint of that nature must come from his positive agreement. And such we think is the present tendency of the law.

The plaintiffs cite *Burrows* v. *Foster*, 32 Beavan, 18; *Labouchere* v. *Dawson*, 13 L. R., Eq. Cas., 332; *Quinn* v. *Cooper*, 14 Ch. D., 596; and *Leggott* v. *Barrett*, 43 Law Times, N. S., 641. The Court of Appeal, in *Pearson* v. *Pearson*, 27 L. R., Ch. D., 145, commented upon the last three of these cases in 1884. In that case Theophilus Pearson, as trustee of a will, carried on a business which had been carried on by the testator under the name of James Pearson. By an agreement made to compromise a suit, James Pearson, a son of the testator, and a beneficiary under his will, agreed to sell to Theophilus Pearson all his interest in the business, and in the property on which it was carried on; and it was provided that nothing in the agreement should prevent James Pearson from carrying on the like business where he should think fit and under the name of James Pearson. Theophilus Pearson brought an action to enforce this agreement and to restrain James Pearson from soliciting the customers of the old firm. An injunction was accordingly granted by KAY, J., on the authority of *Labouchere* v. *Dawson*, Law Reps., 13 Eq. Cas., 322, and the cases in which it had been followed. It was held by BAGGALLAY and COTTON, L. Js. (LINDLEY, L. J., dissenting,) that *Labouchere* v. *Dawson* was wrongly decided and ought to be overruled, and that even apart from the proviso in the agreement, the plaintiff was not entitled to the injunction which he had obtained. The judges remarked substantially as follows:—

BAGGALLAY, L. J., said:—"In this case the defendant agreed to sell to the plaintiff his interest in a business, which agreement was carried into effect by an order of the 27th of March, 1884, in another action. In the present

action Mr. Justice KAY has granted an injunction restraining the defendant from issuing a certain circular and from privately by letter, or personally, or by traveller, asking any person who prior to the 27th of March, 1884, was a customer or correspondent of the late firm whose business was that day sold to the plaintiff, to deal with the defendant or not to deal with the plaintiff. The defendant has not appealed as to the circular, but has appealed from the latter branch of the injunction. If the first clause of the agreement, which was confirmed by the order of the 27th of March, 1884, stood alone, I should be of opinion that the sale included the defendant's interest in the good-will, and I will first deal with the case as if that clause stood alone. Treating the case as a simple sale of the defendant's interest in the good-will, then if *Labouchere* v. *Dawson* is to be treated as laying down the law correctly, the plaintiff is entitled to retain his injunction. I have before expressed doubts as to the decision in that case, and the argument which we have now heard not only has not removed those doubts, but has led me to the conclusion that they were well founded. I am aware that the decision in that case has been followed on two or three occasions; it has been approved by one judge and disapproved by another; but it has never been either approved or disapproved by the Court of Appeal collectively. In that case an agreement in writing was entered into for the sale of a brewery at Kirkstall, and the plant, fixtures, utensils and machinery in and about the same, and the good will of the brewery business theretofore carried on upon the premises. Lord ROMILLY there laid down that the seller of a business with its good-will may, in the absence of any express agreement to the contrary, carry on the same business wherever he pleases, and solicit customers in any public manner, but that he must not apply to any of the old customers privately, by letter, personally, or by traveller, asking them to continue their custom with him and not to deal with the vendees. His lordship went on the principle that persons are not at liberty to depreciate the thing which they have sold. Be-

fore that decision the law was to be collected from the cases
of *Churton* v. *Douglas*, Johnson, 174, and the earlier cases
of *Cook* v. *Collingridge*, Collyer on Partnership, 2d ed.,
p. 215; *Cruttwell* v. *Lye*, 17 Ves., 335; and *Johnson* v. *Hel-
leley*, 2 DeG. J. & S., 446. The effect of Lord HATHERLEY's
judgment in *Churton* v. *Douglas* is that the vendor may
carry on the same business where and as he pleases, and
deal with the customers of the old firm, provided only that
he does not represent himself as carrying on the old busi-
ness or as being the successor of the old firm. It is ad-
mitted that *Labouchere* v. *Dawson* went beyond anything to
be found in the earlier cases. There are three decisions on
the subject by Sir GEORGE JESSEL. In *Ginesi* v. *Cooper
& Co.*, 14 Cha. Div., 599, it was distinctly laid down by
that learned judge that a trader who had sold his business
and the good-will of it could not deal with the old custom-
ers. The injunction, however, as granted, did not go that
length, which may be the reason why there was no appeal.
In *Leggott* v. *Barrett*, 15 Cha. Div., 306, Sir GEORGE
JESSEL granted an injunction to restrain the defendant
from applying to any customer of the firm privately, or by
letter, personally or by a traveller, asking such customer to
continue to deal with the defendant or not to deal with the
plaintiff, or from actually dealing with such customer as
a customer. There was no appeal from the first part of
the injunction, but the defendant appealed from the
second part, and the Lords Justices JAMES, BRETT and
COTTON all agreed that there ought not to be any injunc-
tion against dealing with the customers of the firm. As
the defendant submitted to the first part of the injunction
the Court of Appeal did not deal with it, but Lords Jus-
tices JAMES and COTTON suggested doubts as to its pro-
priety. In *Walker* v. *Mottram*, 19 Cha. Div., 355, Sir
GEORGE JESSEL extended the doctrine of *Labouchere* v.
*Dawson* to a case where the good-will had been sold, not
by the trader himself but by his trustee in bankruptcy.
The Court of Appeal held that the doctrine could not be
extended to compulsory sales, and that the bankrupt could

not be restrained from soliciting the customers of the old business. My colleagues, Lords Justices LUSH and LINDLEY did not in that case express any dissent from *Labouchere* v. *Dawson,* but used expressions which may be read as tending to show that they approved of it. I expressed my opinion that it went beyond what any of the previous decisions would have sanctioned, and I reserved my judgment as to its correctness in case the question should ever come before the Court of Appeal. Thus the matter was left in 1881, the Court of Appeal never having in any case given collectively an opinion upon *Labouchere* v. *Dawson.* The case which I then suggested has now occurred. The point calls for our decision, and I feel bound to say that in my opinion, *Labouchere* v. *Dawson* was not correctly decided. It went beyond a number of decisions of a higher court, and I think without sufficient reason. It has been argued that as it has stood for twelve years and been acted upon, it ought not to be overruled, but should be treated by this court as binding and open to be reviewed only by the House of Lords. In support of this the respondent relied much on *Pugh* v. *Golden Valley Railway Company,* 15 Cha. Div., 330, where no doubt stress was laid on the fact that a decision had been standing unimpeached for twenty years, and it was said that it was very undesirable to disturb a rule which had been so long acted upon. The court, however, did not proceed solely or even mainly on that ground; they were of opinion that the decision referred to was right and they followed it. The decision in *Labouchere* v. *Dawson* has not stood wholly unquestioned, and I do not think that we are bound to follow it merely because it has stood for twelve years without being authoritatively overruled. Taking the case then on the first clause of the agreement alone, I am of opinion that the plaintiff is not entitled to the second branch of the injunction. But assuming the first clause, taken *per se,* to amount to a sale of the goodwill, are not its consequences modified by clause third? That clause, which expressly gives the defendant a right to carry on any business wherever he goes under the name of

James Pearson, having regard to its terms, I think that, even assuming *Labouchere* v. *Dawson* to be right, the defendant has done nothing which would entitle the plaintiff to the second branch of the injunction. I rest my decision however upon this—that *Labouchere* v. *Dawson* was wrongly decided, and that under the first clause taken alone the plaintiff is not entitled to the injunction."

COTTON, L. J., said:—"Mr. Justice KAY granted this injunction considering that he was bound by the authorities. The case of the plaintiff is founded on contract and the question is—what are his rights under the contract? There is no express covenant not to solicit the customers of the business; but it is said that such a covenant is to be implied. I have a great objection to straining words so as to make them imply a contract as to a point upon which the parties have said nothing particularly, when it is a point which was in their contemplation. From what is this implied covenant to be inferred? It is said that there was a sale of the good-will, and according to the proper meaning of the word 'good-will' I think that there was. The plaintiff purchased all the interest of the defendant in certain old pottery works. Taking good-will in the sense given by Lord ELDON in *Cruttwell* v. *Lye*, 17 Ves., 335, 346, 'the probability that the old customers will resort to the old place,' we find that here the purchaser has a right to the place and a right to get in the old bills; so the purchaser gets the good-will as defined by Lord ELDON. But the word 'good-will' is not used, and when a contract is sought to be implied we must not substitute one word for another. Such a right as is here contended for might be inferred from a contract to sell the 'good-will,' and yet not be inferred from such a contract as we have here. But suppose the word did occur, what is the effect of a sale of 'good-will?' It does not *per se* prevent the vendor from carrying on the same class of business. But in *Labouchere* v. *Dawson* it is laid down that it implies a contract not to solicit the old customers. I think that decision wrong. In *Cruttwell* v. *Lye* the point did not directly arise, for the

sale was by assignees in bankruptcy; but Lord ELDON says in that case—' The good-will which has been the subject of sale is nothing more than the probability that the old customers will resort to the old place. Fraud would form a different consideration; but if that effect is prevented by no other means than those which belong to the fair course of improving a trade in which it is lawful to engage, I should by interposing carry the effect of an injunction to a much greater length than any decision has authorized or imagination ever suggested.' It is involved in this that if the good-will is sold and fraud is used to prevent the sale from having full effect, the court will interfere; but if customers are prevented by fair means from coming to the old place it will not interfere. In *Kennedy* v. *Lee*, 3 Mer., 441, 452, expressions are used which are material as regards a contract in the present form. ' The words *concern* and *inheritance* are used inartificially, and cannot be construed as having any reference but to the actual subjects of valuation. And when the plaintiff offers to take the business himself, he could not have forgotten that the defendant's own estate lay contiguous to the partnership property, and therefore his introducing no stipulation with reference to the fact of its contiguity is a clear intimation that when he wrote this letter he had no intention, in offering to take the partnership property, to purchase with it the good-will, in the sense of restricting the defendant from carrying on trade in its vicinity. In that sense at least, therefore, the good-will of the trade was not the subject of contract or treaty even, between the parties.' This, it is true, seems rather to favor the view that a sale of good-will might imply a covenant not to carry on the same trade in the neighborhood. In *Cook* v. *Collingridge*, Collyer on Partnership, 2d ed., p. 215, a partnership business was sold by order of the court, with liberty for any of the partners to bid, and Lord ELDON made an elaborate order by which, after a declaration that there was no obligation restraining any of the partners from carrying on the same business after the sale of the business of the late partnership, and no

obligation to restrain them from uniting in a new partner-
ship in the same business after such sale, and that the claim
to have any estimated value put upon any subject that
could be considered as described by the term 'good-will'
could not be supported on the same grounds or principles
as those upon which a compensation or value was in that
establishment received from a partner buying the share of
the partner going out of the business of this establishment
and retiring from trade or business altogether, it was de-
clared 'that in this case, if the property of the then present
establishment were sold, and the then present partners, or
any of them, with any other persons, engaged in a new
establishment carrying on the same trade or business,
(which they were at full liberty to do,) it was obvious that
if by good-will were meant the value of the chance that the
customers of partners retiring altogether would deal with
those who purchased from such retiring partners and suc-
ceeded to their establishment, a good-will of that nature
could not be valued on the same principles, as the persons
retiring, but not retiring altogether from trade, had also a
chance of conveying the old customers with their new
establishment, which must most materially affect, if it did
not destroy, the chance that the persons purchasing the
old establishment would retain many of the customers of
the old establishment.' A partner then, in Lord ELDON's
opinion, might 'convey' the customers from the purchaser.
He must not do so by unfair means; and it is unfair if he
represents that he is carrying on the old business; but I
think that Lord ELDON was against the notion that the
vendor of the good-will of a business, in the absence of
express contract, is to be restrained from carrying on a
similar business in the way in which he might lawfully
carry it on if there had been no sale of the good-will. Lord
ROMILLY rests his decision in *Labouchere* v. *Dawson* on
the principle that a man cannot derogate from his own
grant. But it is admitted that a person who has sold the
good-will of his business may set up a similar business next
door and say that he is the person who carried on the old

business, yet such proceedings. manifestly tend to prevent
the old customers going to the old place.   I cannot see
where to draw the line ; if he may by his acts invite the old
customers to deal with him and not with the purchaser,
why may he not apply to them and ask them to do so ?   I
think it would be wrong to put such a meaning on 'good-
will' as would give a right to such an injunction as has
been granted in the present case.   I have thought it right
to rest my judgment on the ground that *Labouchere* v.
*Dawson* is not to be followed, but the present case is less
favorable to the plaintiff than that case, for not only have
we no contract against carrying on the business, but the
third clause shows it to have been in the minds of the par-
ties that the defendant should carry on business, and I
think that this stipulation entitles him to get customers in
any fair way of managing his trade.   It is urged that
*Labouchere* v. *Dawson* has so long been treated as settled
law that we ought not to disturb it.   It is true that for
eight years that decision does not appear to have been
questioned by any judge, and there is no doubt it has
been followed by other judges in courts of first instance.
It was however doubted in *Leggott* v. *Barrett*, 15 Cha.
Div.; 306, by Lord Justice JAMES and myself, and has
never received the sanction of the Court of Appeal.   I
think that under these circumstances we ought not to treat
it as binding and encourage parties to shape their contracts
on the authority of a case which the House of Lords may
determine to have been erroneously decided.   It is not
generally desirable to decide an important point on an in-
terlocutory application ; but as we come to the conclusion
on a question of law that the plaintiff is not entitled to the
injunction, it is, we think, right for us to decide the matter
now."

LINDLEY, L. J., said :—" The rights of the parties in this
action depend on the agreement into which they have
entered.   That agreement was not an ordinary contract for
sale, but an agreement to settle disputes between the
parties.   If we look at the position of the parties we find

that the plaintiff, Theophilus Pearson, as trustee, had carried on this business, and that James Pearson, the defendant, was one of the *cestuis que trust*, had helped in the business, and had been employed in it as a traveller. By the agreement James Pearson gives up all his interest in the business for £2,000. Pausing there, although the good-will is not in terms mentioned in the agreement, I think that it is included; for a man who sells all his interest in a business cannot retain any interest in the good-will. Then by clause third it is provided that nothing in the agreement shall be deemed to restrict or prevent James Pearson from carrying on the business of a potter, earthenware manufacturer, or any other business, at such place as he may think fit, and under the name of James Pearson. That is an important stipulation which obviously was introduced for the benefit of James Pearson. By it he says in substance —Though I have sold to you all my interest in this business I am to have liberty to carry on business in my own name where I please. That means,—I am to be as free to carry on business as if I had not sold to you, and in the same way as if I had not sold to you. I think, therefore, that this case is not governed by *Labouchere* v. *Dawson,* and that the defendant, assuming that case to have been rightly decided, may yet solicit the custom of any. As to *Labouchere* v. *Dawson,* there has been a difference of opinion. For my own part I am of the opinion that it was rightly decided. It is true that, as was pointed out in *Walker* v. *Mottram,* 19 Cha. Div., 355, it went beyond the preceding cases; but did it go beyond them so far as to be wrong? It was on the principle that a person who has sold the good-will of his business shall not derogate from his own grant by doing what he can to destroy the good-will which he has sold. It is true that if this principle were logically carried out it would prevent the vendor carrying on the same sort of business as he has sold; and if the court had held that he could not I do not think that the decision could have been complained of. It startles a non-lawyer to be told that if he buys a business and its good-will, the

seller can immediately enter into competition with him next door. The courts however have held that this can be done; but I think that Lord ROMILLY was right in not applying this doctrine to a case where the vendor directly applies to his old customers to induce them to continue dealing with him instead of the purchaser. Sir GEORGE JESSEL and the Lord Justice LUSH were of the same opinion; but I believe there are other judges besides my learned brothers who think the decision in *Labouchere* v. *Dawson* wrong."

The plaintiffs cite *Hall's Appeal*, 60 Penn. St., 458, and *Angier* v. *Webber*, 14 Allen, 211. In the first case it is said that "good faith requires of a party who has sold the good-will of his business that he should do nothing which tends to deprive the purchaser of its benefit and advantages. The bill charges and the evidence shows that he is holding himself out to the public by advertisement as having removed from his former place of business, No. 1313 Vine street, to his present place of business, No. 1539 Vine street, where he will continue his former business. It is clear that he has no right to hold himself out as continuing the business which he sold to the plaintiff, or as carrying on his former business at another place to which he has removed."

In *Angier* v. *Webber* the defendant sold the good-will of a business to the plaintiff, and stipulated in writing not to do anything "which should in anywise impair or injure said interest and good-will." It was held that it was a violation of this agreement to carry on the same kind of business at a place near the old one.

In *Bergamini* v. *Bastian*, 35 Louis. Ann., 60, there was a sale of a commercial establishment, together with the good-will thereof. The court said:—" Holding, as we do, that he was not in the least precluded by any stipulation in his contract with the plaintiff from resuming the business of a saloon and lunch house in any portion of the city, we must recognize his right to resort to ordinary means of advertising his business, and to other modes of soliciting patronage or custom; and the evidence, which we have read carefully

and considered materially, fails to show that he directed his efforts to draw custom from Bergamini more than from any other dealer in the same line of business."

In *Hanna* v. *Andrews*, 50 Iowa, 462, the court said:— "What the appellee agreed to do was to transfer his list of lands and correspondence and the good-will of his business, and give letters of introduction. If we should concede that the sale of the good-will of a business, without restriction upon the seller, would raise an implied agreement not to re-engage in the same business in the same place, such concession would not, we think, aid the plaintiff. By the terms of the appellee's contract it was allowable for him, after three years, to re-engage in the land agency business, and the only question is as to what extent he may do so. It appears to us that when the appellant provided for the return of the appellee to the business after three years, he opened the door to the appellee to come in and compete with him in every respect. The appellee, if applied to, could certainly accept the agency of the lands in question. He could certainly compete for the agency by general advertisement, by acquaintance and by fidelity to business. The courts, we think, could not properly undertake to draw the line between such competition and that which should be carried on by more or less direct solicitation."

In *Barrett* v. *Percival*, 5 Allen, 345, the marginal note says that " a bill of sale of a stock of goods in a store and the good-will of the vendor's trade and all the advantages connected with the store, does not import an agreement by the vendor not to engage in a similar business; and parol evidence is incompetent to prove such an agreement as a part of the consideration for the price named in the bill of sale." The court said:—" The other objection is equally decisive. The parties having reduced their contract to writing, their rights under it must depend on the true interpretation of its terms, irrespective of any parol evidence of what took place previously to or at the time of the making of the agreement. Looking only at the written contract, we are unable to see any clause which can be

construed into an agreement by the defendant's testator to refrain from engaging in a similar business to that which he sold to the plaintiffs. There was no express agreement to that effect, nor can any be implied from that clause of the bill of sale by which the vendor conveys the good-will of his trade and all the advantages connected with the store and premises. It was nothing more than a sale of the custom or trade which appertained to the place where the vendor was then carrying on his business. This was the real subject matter of the contract between the parties, and it cannot be construed as imposing any personal restraint on the vendor, or as restricting his right to transact a similar business in another place at a subsequent time. Whenever such is the intent of the parties, it is carried into effect by an express stipulation which, if not in undue restraint of trade, may be valid and binding. But we know of no case where any such agreement has been raised by mere implication arising from the sale of the good-will of a person's trade in connection with a particular place of business where it has been carried on."

In *White* v. *Jones*, 1 Abbott's Practice Reps., N. S., 337, it is said:—" The sale by Jones to White on the dissolution of their copartnership of his interest in it, and of the good-will of the entire business, did not deprive Jones of the legal or equitable right to engage in and prosecute a similar business in the vicinity of the place of business of the dissolved firm. This seems to be so well settled that nothing more is necessary than to refer to some of the prominent cases affirming this doctrine. *Crutwell* v. *Lye*, 17 Ves., 344; *Davis* v. *Hodgson*, 25 Beav., 177; *Churton* v. *Douglas*, 1 H. V. Johnson, 176; *Howe* v. *Searing*, 6 Bosw., 354; *Dayton* v. *Wilkes*, 17 How. Pr., 510. The complaint does not allege that the defendant in prosecuting his business at 710 Broadway represents it to be the same business which the dissolved firm carried on at 658 Broadway, or that he is conducting business at 710 Broadway as successor to the late firm of Jones & White. It does allege that Jones has opened letters, etc., directed to Jones & White, to Jones,

White & Co., and to Jones, White & McCurdy, intended for the plaintiff; that such letters were from customers of the late firm of Jones & White, and contained orders for goods; and that Jones has filled such orders and received payment for the goods ordered; and judgment is prayed that Jones be enjoined from receiving or opening any letters or orders directed as aforesaid, or from filling the orders, or from in any way interfering with the business of the former firm or the good-will thereof; and for damages. The defendant has a right to establish and carry on in his own name a business similar to that of the late firm so long as he does no act to lead customers into the belief that he is carrying on business as the successor of the old firm, or that when dealing with him they are dealing with White or with the person succeeding to the business of the late firm of Jones & White."

If, therefore, we subject the defendant to the obligation which rests upon Nathan Babcock, the plaintiff's fourth reason of appeal remains without foundation.

There is no error in the judgment complained of.

In this opinion the other judges concurred.